1
2
3
4
5
6
7
8
9
10
11

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

GILBERT FIGUEROA,

                              Plaintiff,

        v.

GILL, *et al.*,

                              Defendants.

Case No. 2:22-cv-00477-ART-DJA

ORDER GRANTING SUMMARY
JUDGMENT

12    *Pro se* Plaintiff Gilbert Figueroa, an inmate in custody of the Nevada
13  Department of Corrections ("NDOC"), brings this 42 U.S.C. § 1983 action against
14  officers of the Las Vegas Metropolitan Police Department ("LVMPD"), claiming that
15  they used excessive force in violation of his Fourth Amendment rights when they
16  shot him with a beanbag shotgun in April 2020. Two Defendants, Rafael Gil and
17  Donald Fletcher, have brought a motion for summary judgment, arguing that
18  they are entitled to qualified immunity on Figueroa's excessive force claim (ECF
19  No. 67). Also pending before the Court is Figueroa's motion for a time extension
20  for his response (ECF No. 80), which is now moot as Figueroa subsequently filed
21  a timely response (ECF No. 81).

22    Although the Court finds that plaintiff has stated a potential excessive force
23  claim, the Court finds that Defendants Gil and Fletcher are entitled to qualified
24  immunity and therefore grants Defendants' motion for summary judgment.

25    **I.    BACKGROUND**
26        **A. Factual Background**
27    The facts summarized below are undisputed unless otherwise noted.
28

### 1. Officers Encounter Figueroa

On April 16, 2020, at around 10:00 p.m., Figueroa called 911 stating that he was hearing voices. (ECF No. 67-1 at 2.) At around 11:30 p.m., officers made contact with Figueroa, who told them that someone was following him and trying to kill him. (*Id.* at 3.) Officers calmed Figueroa down, advised him to stay at a friend's house, and waited with him until he got onto a bus. (*Id.*) Officers cleared the call at 11:40 p.m. (*Id.*)

Approximately 30 minutes later, Officer Eduardo Guardado reported that Figueroa ran in front of his patrol vehicle and other traffic and stated that people were following him to kill him. (ECF No. 67-2 at 3.)[1] Guardado called for emergency medical assistance and applied for emergency admission to a mental health facility or hospital.  (ECF Nos. 67-2 at 3; 67-3 at 2; 67-4 at 3.) American Medical Response responded to the call and transported Figueroa to Spring Valley for further evaluation. (ECF No. 67-4 at 3.) Emergency personnel reported that Figueroa was combative when they attempted to put on a seatbelt, so they placed him in four-point restraint for safety, after which he was cooperative. (*Id.*)

At Spring Valley Hospital, the attending doctor reported that Figueroa presented with suicidal ideation, admitted to using methamphetamine, had been running down the street yelling, and stated that he wanted help getting off methamphetamine. (ECF No. 67-5 at 3.) Laboratory tests confirmed the presence of methamphetamine and cannabinoids in his system. (ECF No. 67-5 at 5.) Upon reexamination, the doctor reported that Figueroa denied suicidal or homicidal ideation and attributed his symptoms to methamphetamine abuse. (*Id.*) Figueroa was taken off the legal hold. (*Id.*)

---

[1] The arrest report provided by Defendants states that this occurred at 10:04 p.m., before the first interaction with officers. (ECF No. 67-6 at 5.) This conflicts with the incident reports. (ECF Nos. 67-1; 67-2.)

### 2. Figueroa's Flight From Hospital

While the hospital was waiting to hear back from another facility for a possible transfer, Figueroa ran out of the hospital. (*Id.*) Defendants have not provided further dispatch reports from this point onwards. According to the arrest report, paramedics Michael Kruziak and Jonathan McCoy observed Figueroa fleeing the hospital and followed him in an ambulance. (ECF No. 67-6 at 5.) Figueroa ran into a gated community after the ambulance activated the sensor in the community gate. (*Id.*) Figueroa ran along Maddies Way checking doors, attempting to open doors, and screaming for help. (*Id.*)

Edgar Ramos, a resident at 6684 Maddies Way, told investigators later that at around 2:00 a.m., he heard a man screaming for help and saw him running from an ambulance. (ECF No. 67-7 at 3.) A few minutes later, he heard the man banging on his door. (*Id.* at 4.) Ramos got scared when he heard the man attempting to break the window, dialed 911, and went into his garage, where he held the door shut. (*Id.* at 4-5.) Ramos told the 911 operator that he could hear the man going upstairs. (*Id.* at 5.) Ramos then heard officers outside, opened the garage and met officers who pulled him to safety. (*Id.* at 6.) Officers asked Ramos if he had any weapons and Ramos said "No – only knives." (*Id.* at 6.) Ramos then said that he had an axe which was hidden. (*Id.*) Ramos then saw the man open the door from the house to the garage and saw that he was holding a knife. (*Id.*) The man then closed the door and went inside. (*Id.* at 7.) Ramos heard noises "[l]ike he was destroying stuff." (*Id.*) Ramos stayed away from the house for the remainder of the events. (*Id.*)

Defendants Gil and Fletcher were among the LVMPD officers who responded to Ramos's home. (ECF No. 67-6 at 4.) Gil's body-worn camera footage shows that he arrived as Ramos exited the garage. (Ex. H at 00:30.) Gil walked around the house to the backyard. (*Id.* at 00:50.) Gil remained in the backyard for around five minutes, communicating with other officers via radio.

(*Id.* at 1:00-5:30.) The house was mostly quiet. (*Id.*) During that time, Gil reported to other officers via radio that he thought Figueroa was on the second floor. (*Id.* at 2:40.) Gil requested to be swapped out to get the "tac vehicle." (*Id.* at 3:23.) An officer on the radio requested communication with the hospital to "get a name on this guy." (*Id.* at 4:25.) After around five minutes, Gil reported pounding on the rear second floor window. (*Id.* at 5:30, 5:42.) At this point, Gil was the only officer in the backyard. (*Id.* at 5:53.) After shining a torch at the window, Gil reported that "it looks like he's armed with a [] butcher knife." (*Id.* at 7:30.) Gil walked around the house to his patrol car and retrieved a less lethal shotgun, or beanbag gun, before returning to the backyard. (*Id.* at 7:50-9:27; ECF No. 67-16 at 2.)

Approximately ten minutes after arriving, Gil reported that the inside of the house was on fire. (Ex. H at 9:40.) A small object in flames fell from the upstairs window. *(Id.* at 9:50.) Two larger objects then fell from the window, smashing the glass. (*Id.* at 9:53-59.) A propane tank in the backyard appeared to be close to the object in flames. (*Id.* at 10:00.) A few seconds later, Figueroa yelled from the upstairs window. (*Id.* at 10:08.)

### 3. Gil's Use of Force

Shortly after throwing objects from the window, Figueroa jumped out of the window—almost entirely naked—into the backyard. (*Id.* at 10:15.) As reported later, Gil observed that Figueroa was covered in blood and wearing a hospital gown. (ECF No. 67-16 at 2.) While Figueroa was jumping, Gil aimed the beanbag gun at him and said: "I'm gonna hit him, I'm gonna hit him." (Ex. H at 10:15.)

Figueroa landed at the far end of the yard, behind what appears to be a covered table. (*Id.*) Gil walked towards the table as Figueroa stood up. (*Id.* at 10:16-19.) At around this time, Officer Fletcher arrived at the scene. (Ex. X at 00:50.) Fletcher's body-worn camera footage shows that Gil and two other

officers had weapons pointed at Figueroa. (*Id.* at 00:58.) Gil and other officers shouted "get on the ground" four times while Gil walked towards Figueroa. (Ex. H at 10:20-24.) At this point, Figueroa's movements are not visible in Gil's body-worn camera footage. (*Id.*)

Approximately five seconds after Figueroa stood up, Gil fired a shot. (*Id.* at 10:24.) Although Figueroa is not visible from Gil's body-worn camera footage, Fletcher's video shows Figueroa in the corner of the backyard with his hands on top a gate at this point. (Ex. X at 01:00.) Figueroa did not comply with commands to get on the ground. Over the next five seconds, Gil fired three more shots, interspersed with warnings to "get on the ground." (*Id.* at 10:25-10:30.) After the third shot, Figueroa jumped over the gate. (Ex. X at 01:00.) Figueroa then ran along the side of the house towards the front. (*Id.* at 10:35-40.)

### 4. Arrest

At the front of the house, there were several officers with guns and tasers drawn. (Ex. S at 11:07.) Figueroa walked with his hands up as officers yelled at him to "get on the ground." (*Id.*) Figueroa complied with commands to get on the ground and put his hands behind his back. (*Id.* at 11:13, 11:29.) Officers handcuffed Figueroa, who was bleeding profusely, and began giving him medical attention. (*Id.* at 11:33, 14:00.) As officers came towards him, Figueroa said, "they are trying to kill me," and repeatedly asked to be taken to jail rather than to hospital. (*Id.* at 11:35-19:00.) After rendering aid to Figueroa, officers placed a net over his head and lifted him onto a stretcher and into the ambulance. (*Id.* at 19:30-23:00.)

Upon admission to the hospital, Figueroa was diagnosed with injuries from the beanbag gunshots—including a wound in his left thigh, a wound in his right lower leg, and left scrotal hematoma—and lacerations from the glass window. (ECF No. 67-9 at 3-4.) Figueroa reportedly lost half a liter of blood at the scene. (*Id.* at 5.) Figueroa was sedated during treatment after kicking a

doctor in the head. (*Id.*) X-Rays revealed a "proximal fibular fracture secondary to gunshot injury, with indwelling metallic bullet fragment present" and "large metallic bullet fragments seen within the [left femur] anterior soft tissues." (*Id.* at 17.) Figueroa was treated for the gunshot wounds and received orchietomy (testicle removal surgery) due to the testicular rupture. (*Id.* at 29.) Psychiatry resident Dr. Lau noted a diagnosis of: "unspecified schizophrenia spectrum rule out schizophrenia vs substance induced psychosis" and "methamphetamine use disorder, severe." (*Id.* at 31.) Dr. Lau reported a plan to "continue [Legal 2000] as patient demonstrates himself to be a danger to self and others secondary to possible underlying psychiatric disease." (*Id.* at 31.)

On April 19, Dr. Lau saw Figueroa for another psychiatric consultation, after which Dr. Lau discontinued Figueroa's Legal 2000, finding that his symptoms were related to drug intoxication and that he no longer met criteria. (*Id.* at 36.) On April 20, Figueroa was discharged from hospital. (*Id.*)

Figuera was charged with several crimes as a result of the events of the morning of April 17, 2020. (ECF No. 67-6 at 7-8.) Figeroa pled guilty to three counts in Clark County district court: invasion of the home in violation of NRS 205.067 (a category B felony), second degree arson in violation NRS 205.015 (a category B felony), and assault on a protected person in violation of NRS 200.571 (a gross misdemeanor). (ECF No. 67-12.)

### 5. LVMPD Use of Force Policy

LVMPD's written policy permits officers to use reasonable force to protect themselves, protect others, effect a detention, effect an arrest, or conduct a search. (ECF No. 67-15 at 7.)

The policy authorizes use of force with a firearm, including a low lethality shotgun, under specific circumstances. (*Id.* at 21.) The policy instructs that "[p]rior to firing a low lethality shotgun, when feasible, the officer will announce

1  a warning to the subject and other officers of the intent to deploy the low

2  lethality shotgun if the subject does not comply with commands" and the officer

3  "shall give the subject a reasonable opportunity to voluntarily comply." (*Id.*) The

4  low lethality shotgun "should only be used against persons who are armed with

5  a weapon that could cause serious injury or death to themselves or others, or

6  when a subject poses an imminent threat to the safety of the officer or other

7  persons." (*Id.* at 22.) In addition, officers are cautioned to "aim[] at the abdomen

8  and target the large muscle groups of the buttocks, thigh, and even the knees of

9  the subject" and instructed that "[t]he head, neck, and groin should be

10  avoided." (*Id.* at 23.)

11       Under LVMPD policy, the use of a low lethality shotgun constitutes

12  intermediate force if it is fired at a distance of five yards or greater, but deadly

13  force if fired at a distance of less than five yards. (*Id.* at 8.) Deadly force is

14  defined as "the degree of force which is likely to produce death or serious bodily

15  injury." (*Id.*) Officers are permitted to use deadly force upon another person only

16  when it is "objectively reasonable" to "[p]rotect themselves or others from what

17  is reasonably believed to be an imminent threat of death or serious bodily

18  injury" or "[p]revent the escape of a fleeing felon who the officer has probable

19  cause to believe has committed a violent felony crime and is an imminent threat

20  to human life if escape should occur." (*Id.*) Officers are instructed to "give some

21  warning, if feasible, before the use of deadly force." (*Id.*) Officers are also

22  instructed to complete a Use of Force Report after using a low lethality shotgun.

23  (*Id.* at 27.) When officers use deadly force or force involving serious bodily injury

24  or death, the department investigates the use of force. (*Id.* at 29.)

### 6. Use of Force Report

26       In a Use of Force Report completed after the incident, Gil stated that he

27  believed Figueroa "posed a clear and imminent threat to himself and the safety of

28  officers" because he had broken into an occupied residence, run out of the garage

7

with a large kitchen knife in his hands, had the knife upstairs in the bedroom, set the room on fire and broke the window, jumped out of the window in an attempt to flee the scene, and refused to obey verbal commands. (ECF No. 67-16 at 2-3.) Gil stated that he fired four rounds at Figueroa because he "believed [Figueroa] still had a weapon on him and if not apprehended, he may use it to hurt [Gil's] partners or [Gil]." (*Id.* at 3.) Gil reported that the distance between himself and Figueroa was "16-20 feet." (*Id.* at 4.)

The Use of Force Report was forwarded to Gil's supervisor, Fletcher, who provided an investigative report. (*Id.* at 9.) After interviewing Gil and reviewing other evidence, Fletcher concluded that Gil used an objectively reasonable amount of intermediate force in accordance with LVMPD policy. (*Id.* at 10.) The report was forwarded to Lieutenant Charles Peck, who agreed with Fletcher's assessment. (*Id.* at 11.)

### 7. Crime Scene Investigation

After oral argument, Defendants supplemented this motion with LVMPD crime scene investigation field notes (ECF No. 95-2), a photograph of the scene taken after the incident (ECF No. 95-3), and a declaration from LVMPD crime scene investigator Tabatha Paine (ECF No. 95-1). After reviewing the body-worn camera footage, Paine placed orange cones at the positions where Gil and Figueroa appeared to be standing when Gil shot Figueroa. (ECF No. 95-1 at 3.) Paine measured the distance between the cones with a battery-powered laser measuring device, which showed a distance of approximately 17 feet and 11 inches. (*Id.*) Defendants have provided additional calculations corroborating this distance based on Paine's field notes, sketch, and on-site measurements. (ECF No. 95-5.)

### B. Procedural History

In March 2022, Figueroa filed a complaint in this Court, alleging various constitutional claims. (ECF No. 1.) After screening his First Amended Complaint,

the Court allowed Figueroa to proceed on his claim of excessive force in violation of the Fourth Amendment against Officer Gil, Sgt. Fletcher, and Sgt. Prettle. (ECF No. 13.) The Court later granted Figueroa leave to amend his complaint to include a conspiracy claim against Officer Roos, Officer Bettencourt, and an unnamed officer. (ECF No. 51.) The operative complaint at this time is the Second Amended Complaint. (ECF No. 53.) In May 2024, Gil and Fletcher filed a motion for summary judgment on the Fourth Amendment claim. (ECF No. 67.) In November 2024, this Court heard oral argument on that motion. (ECF No. 89.)

## II.    LEGAL STANDARD

A "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are drawn in the nonmovant's favor. *See id.* at 255. Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    DISCUSSION

In their motion for summary judgment, Defendants argue that Gil and Fletcher are entitled to qualified immunity. (ECF No. 67.)

The Supreme Court has set forth a two-part analysis for resolving government officials' qualified immunity claims. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Under this analysis, "[q]ualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal statutory or

constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) (internal quotation marks and citations omitted). First, the court must consider whether the facts "[t]aken in the light most favorable to the party asserting the injury . . . show [that] the [defendant's] conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. Second, the court must determine whether the right was clearly established at the time of the alleged violation. *Id.* A right is clearly established if, at the time of the challenged conduct, "every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations and quotations omitted).

### A. Whether Gil Violated Figueroa's Fourth Amendment Right

Figueroa's excessive force claim is based on Gil's use of the beanbag shotgun. The use of force to effect an arrest is examined under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386 (1989). "Under the Fourth Amendment, officers may only use such force as is 'objectively reasonable' under the circumstances." *Jackson v. City of Bremerton,* 268 F.3d 646, 651 (9th Cir.2001) (citing *Graham,* 490 U.S. at 397). Determining whether a particular use of force is reasonable requires a fact finder to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396 (internal quotation marks omitted). The "reasonableness" of a particular use of force must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

If the evidence, viewed in the light most favorable to Plaintiff, could support a finding of excessive force, then Defendants are not entitled to summary judgment. *Smith v. City of Hemet* 394 F.3d 689, 701 (9th Cir. 2005). "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed

factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Id.*

### 1. Nature of the Intrusion

The Court first must "assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011). A beanbag shotgun is a "twelve-gauge shotgun loaded with beanbag rounds, which consist of lead shot contained in a cloth sack." *Id.* at 872 (internal quotation marks and citation omitted). The Ninth Circuit has observed that the euphemism "beanbag" round "grossly underrates the dangerous of this projectile," which "can kill a person if it strikes his head or the left side of his chest at a range of under fifty feet." *Deorle v. Rutherford*, 272 F.3d 1272, 1279, n. 13 (9th Cir. 2001).

According to LVMPD's policy, the use of a beanbag shotgun constitutes intermediate force if fired from five yards (fifteen feet) or greater, but deadly force if fired from less than five yards (fifteen feet). The crime scene investigator notes, declaration, and body-worn camera footage suggest that the shots were fired from approximately seventeen feet, therefore constituting intermediate force under LVMPD policy. Though "less than deadly," the use of a beanbag shotgun in this case is severe and "permissible only when a strong governmental interest compels the employment of such force." *Deorle*, 272 F.3d at 1280. The Court notes that, had Gil been just two feet closer to Figueroa, the use of force would have been considered deadly.

### 2. Governmental Interests

Courts evaluate the government's interest in using force by examining three core factors: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Bryan*

*v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396). These factors are not exclusive, and courts "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Id.* (internal quotation marks and citation omitted). Courts may also consider: the decision-making time constraints of a changing situation; the type and amount of force used; alternative available methods of taking a suspect into custody; whether it was practical to warn of the imminent use of force; and whether it should have been apparent to the officer that the person was emotionally disturbed. *See* Ninth Circuit Model Civil Jury Instruction 9.25; *see also Bun v. City of Livermore*, No. 17-CV-06418-EMC, 2022 WL 2833971, at *6 (N.D. Cal. July 20, 2022).

### a. Severity of the Crime

"The character of the offense is often an important consideration in determining whether the use of force was justified." *Deorle*, 272 F.3d at 1280. Figuera was charged with home invasion, burglary, arson, destroying the personal property of another, and attempted murder for the events that occurred prior to Gil's use of force. (ECF No. 67-6 at 8.) Of those charges, Figueroa pled guilty to two felonies: invasion of home and second-degree arson. (ECF No. 67-12.)[2] The fact that these are felonies is not determinative: "[a] wide variety of crimes, many of them nonviolent, are classified as felonies." *Chew v. Gates*, 27 F.3d 1432, 1442 (9th Cir. 1994). But because these are serious crimes, this factor weighs in favor of Gil.

### b. Immediate Threat to the Officers' Safety

"The most important factor under *Graham* is whether the suspect posed an immediate threat to the safety of the officers or others." *Bryan*, 630 F.3d at 826 (internal quotation marks and citation omitted). Defendants argue that a

---

[2] Figueroa also pled guilty to assault on a protected person, but for events that occurred after the use of force. (*Id.*)

reasonable officer "could conclude that Figueroa was extremely reckless, aggressive, and dangerous" and therefore that he posed an "immediate threat to the officers and people in the neighborhood." (ECF No. 67 at 23.) The summary judgment record indicates that prior to Gil's use of the beanbag shotgun, Figueroa had fled from hospital, broken into a home, armed himself with a knife, set objects in the house on fire, broken a window, and jumped out of the second-floor window.

However, the record also indicates that Figueroa never verbally threatened any officers, never physically threatened any officers, and never charged at officers. The record indicates that Ramos, the sole resident of the house Figueroa broke into, was out of the house and safe well before Gil's use of force. The front of the house was surrounded by police officers, the backyard and both sides of the house were surrounded by a high wall, and at the time Gil shot Figueroa, Figueroa was attempting to get over a gate which led to the front of the house. Gil's statement that he observed Figueroa armed with a knife through the upstairs window is not corroborated by video evidence and is not enough alone to establish an immediate threat to the safety of the officers. A court "cannot simply accept what may be a self-serving account by the police officer." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994). When Figueroa jumped from the window, he was almost naked—the hospital gown was falling off him—and therefore had no place to hide a weapon. When Gil shot Figueroa, Figueroa had his hands on the top of the gate, was not attempting to get over the wall towards the neighboring house, and was not engaging in threatening behavior.

Faced with this conflicting evidence, a reasonable trier of fact could conclude that Figueroa did not pose an immediate threat to the safety of the officers or others at the time Gil used force. *See, e.g., Bun v. City of Livermore*, 2022 WL 2833971, at *7; *Chew*, 27 F.3d at 1442.

### c. Attempting to Evade Arrest

Next, the Court considers whether Figueroa was "actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. The record is clear that Figueroa was attempting to evade arrest by flight at the time that Gil used force. Figueroa was standing by the fence, attempting to get over it and away from the officers, while he was being shot by Gil. He then got over it and ran into the front yard, where he became compliant and did not attempt to evade arrest—but this was after Gil's use of force. This factor therefore weighs in favor of Gil.

### d. Decision-Making Time Constraints

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. In *Deorle*, this factor weighed in the defendant's favor because the officer "and a host of other officers were at the scene for over half an hour before [the officer] shot [the plaintiff]," the officer "had had an opportunity to observe [the plaintiff] for a considerable period of time prior to firing at him," and the officer "had the opportunity to consult with his superiors concerning the tactics to be employed." *Deorle*, 272 F.3d at 1283.

Defendants do not explicitly argue that Gil had to make a split-second decision, but in his Use of Force Report, Gil notes that: "[d]ue to the dynamic situation it was a split second decision to use force on the suspect to stop him from evading arrest." (ECF No. 67-16 at 3.) The record shows that Gil had to make a quick decision after Figueroa jumped out of the window. However, Gil was in the backyard for approximately ten minutes before the use of force. During that time, he communicated with other officers via radio, walked around the house to the patrol car to retrieve the shotgun, and observed Figueroa's movements through the upstairs window. By the time Figueroa jumped out of the window,

Gil was accompanied by two other officers in the enclosed backyard and knew that several other officers were surrounding the front of the house. Although Gil made a quick decision following Figueroa's jump from the window, the situation here was "far from that of a lone police officer suddenly confronted by a dangerous armed felon threatening immediate violence." *Deorle*, 272 F.3d at 1293.

### e. Type and Amount of Force Used

Gil used a beanbag shotgun to strike Figueroa four times from approximately seventeen feet. The beanbag rounds hit Figueroa in his groin, upper leg, and lower leg. According to LVMPD's use of force policy, this use of force was just two feet from the threshold at which use of a beanbag shotgun is considered deadly force. In *Deorle*, the court observed that a beanbag round was "potentially lethal at thirty feet and could be lethal at distances up to fifty feet." *Deorle*, 272 F.3d at 1279. In this case, the round which hit Figueroa's groin area— which LVMPD policy specifically warns officers to avoid aiming at—caused serious injury and resulted in Figueroa losing a testicle. (ECF No. 67-15 at 23.)

### f. Availability of Alternative Methods

Officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within that range of conduct we identify as reasonable." *Scott*, 39 F.3d at 915. However, officers are "required to consider [w]hat other tactics if any were available, and if there were clear, reasonable and less intrusive alternatives to the force employed, that militate[s] against finding [the] use of force reasonable." *Glenn*, 673 F.3d at 876 (internal quotation marks and citations omitted). Defendants have not offered any argument as to what alternative methods may have been available to Gil, and Gil did not address this factor in his Use of Force Report. (*See* ECF No. 67-16.) A reasonable juror could find that the lack of evidence here suggests that Gil's use of force was unreasonable. This factor therefore weighs in favor of Figueroa.

### g. Warnings

"[W]arnings should be given, when feasible, if the use of force may result in serious injury, and [] the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test." *Deorle*, 272 F.3d at 1284. LVMPD policy instructs officers that "[p]rior to firing a low lethality shotgun, when feasible, the officer will announce a warning to the subject and other officers of the intent to deploy the low lethality shotgun if the subject does not comply with commands" and provides an example: "Police! Do what I am telling you to do, or I will shoot you with a bean bag, and it will hurt." (ECF No. 67-15 at 21.)

Here, it is undisputed that Gil repeatedly shouted at Figueroa: "get on the ground." This is a clear verbal command which Figueroa did not comply with, but it was not a clear warning of Gil's intent to deploy the low lethality shotgun. Figueroa may have seen the shotgun and believed that he was being shot at with live lethal rounds. As the court observed in *Glenn*, "[c]onfusion regarding whether his life was in immediate danger may have led [Figueroa] to seek cover rather than surrender." *Glenn*, 673 F.3d at 876. This factor therefore weighs in favor of Figueroa.

### h. Mental Illness

"[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed, that is a factor that must be considered in determining, under *Graham,* the reasonableness of the force employed." *Deorle*, 272 F.3d at 1283. "In the case of mentally unbalanced persons, the use of officers and others trained in the art of counseling is ordinarily advisable, where feasible, and may provide the best means of ending a crisis." *Id.*

Here, Figueroa argues that Gil should have been aware of his mental illness because he had been placed on a Legal 2000 earlier that night, had escaped from hospital, and was wearing a hospital gown. At the time of the incident, Figueroa

states that he was suffering from paranoia, PTSD, and bipolar disorder. (ECF No. 81 at 5.) Defendants argue that this case is distinguishable from the facts of *Deorle* and *Glenn*, where police were called specifically to address circumstances related to a mental health crisis in which the individual was identified to the officers as being suicidal and behaving erratically, because in this case officers instead "responded to a 911 call because Figueroa had broken into a man's home." (ECF No. 67 at 29.) But the record in this case also indicates that LVMPD officers had encountered Figueroa behaving erratically earlier that night and admitted him to hospital, that Figueroa had been placed on legal hold, escaped from hospital, was behaving erratically, and was wearing only a hospital gown.

Defendants also argue that this case is distinguishable from *Deorle* and *Glenn* because "Figueroa was not emotionally disturbed at the time of the incident; he was high." (ECF No. 67 at 27.) Defendants cite to no caselaw establishing such a distinction and the Court finds this argument unpersuasive, particularly when the record shows that Figueroa was diagnosed with severe methamphetamine use disorder.

Construing the evidence in the light most favorable to Plaintiff, a reasonable juror could conclude that these facts made or should have made it apparent to the officers, including Gil, that Figueroa was mentally ill.

### 3. Weighing the Interests

Whether Gil's use of the beanbag shotgun to strike Figueroa four times, including at his groin, was objectively reasonable requires the Court to consider whether the degree of force was warranted by the governmental interests at stake. The fact that Figueroa had committed serious crimes and was actively evading arrest by flight weights in Gil's favor.

However, construing the record in the light most favorable to Figueroa, the record does not indicate that Figueroa posed an immediate threat to the officers' safety. The record also presents material questions of fact as to whether Gil was

under intense time-constraints when deciding whether to use the less-lethal shotgun, whether viable alternative methods were available, whether sufficient warnings were given, and whether it was apparent to Gil that Figueroa was suffering from mental illness. And the force used was very close to being deadly— just two feet from the threshold by LVMPD's policy and calculations—and at least one shot was fired in violation of LVMPD guidance to avoid the groin area, resulting in serious injury.

Therefore, the summary judgment record, viewed in the light most favorable to Figueroa, demonstrates that the governmental interests were not strong enough to compel Gil's use of force. Accordingly, a reasonable juror could find that Gil used excessive force in violation of the Fourth Amendment.

### B. Whether the Right Was Clearly Established

At step two of the qualified immunity analysis, the Court finds that, although this is a close case, Figueroa has not satisfied his burden to show that Gil's conduct violated clearly established law.

"Even if a government official violates a constitutional right, the official is entitled to qualified immunity unless the violated right was clearly established at the time of the incident." *Andrews v. City of Henderson*, 35 F.4th 710, 718 (9th Cir. 2022). The question at this stage of the analysis is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. "The Supreme Court has increasingly reiterated that to meet this standard a right 'must be defined with specificity' rather than 'at a high level of generality.'" *Id.* (quoting *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam)). A "case directly on point," however, is not required. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 4-5 (2021) (citation omitted). Rather, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

Certain aspects of the law regarding Figueroa's rights were clearly established when Gil fired the beanbag shotgun in April 2020. It was settled that the use of a beanbag shotgun, though less than deadly, is "permissible only when a strong governmental interest compels the employment of such force." *Deorle*, 272 F.3d at 1280. Plaintiff does not argue that a different legal framework, such as the framework for analyzing deadly force, applies here. Therefore, the relevant question is whether a reasonable officer could have concluded that there was a strong governmental interest compelling the use of the beanbag shotgun.

Plaintiff relies primarily on two cases in support of his argument that Gil's conduct violated clearly established law: *Deorle* and *Glenn.* Defendants argue that neither case is sufficient to clearly establish that Gil's conduct in this situation was unconstitutional and argues that the closest case is *Bun v. City of Livermore*, 2022 WL 2833971.

In *Deorle*, the Ninth Circuit held that an officer's use of a beanbag shotgun to shoot the plaintiff in the face was unconstitutional where the plaintiff was unarmed, "emotionally distraught," and had not committed any serious crimes; the officer had an opportunity to observe the plaintiff for a considerable period of time before firing at him; and the officer failed to give the plaintiff a warning or command to halt. 272 F.3d at 1282-85. In *Glenn*, the Ninth Circuit found that disputed facts precluded a grant of summary judgment where an officer used a beanbag shotgun against the plaintiff, a high-school student, who was suicidal and "very intoxicated," "was not wanted for any crime," and had a pocketknife but was not threatening anyone with it. 673 F.3d at 872-74.

In *Bun*, a California district court found that although the plaintiff stated a potential substantive Fourth Amendment violation for excessive force, the officer was entitled to qualified immunity. *Bun*, No. 2022 WL 2833971, at *15. In *Bun*, officers chased the plaintiff, a hit-and-run suspect, after he fled from his vehicle by foot, and then shot him with a beanbag shotgun after he failed to

comply with commands. The court held that the plaintiff had failed to establish that a reasonable officer should have known that deployment of a less-lethal weapon against the plaintiff, as he evaded police, was unreasonable. *Id.* The court found it significant that, unlike *Deorle* and *Glenn*, officers encountered the plaintiff based on their suspicion that he had committed a crime rather than solely due to circumstances involving a mental health crisis; the plaintiff had been evading arrest; the situation was not static; the plaintiff did not respond to the officers' commands; and a witness reportedly yelled that a gun was present. *Id.* at *14-15.

Similar facts here distinguish this case from *Deorle* and *Glenn*. Although Figueroa appeared to be experiencing a mental health crisis, officers were not called to the scene specifically to respond to circumstances related to a mental health crisis. As in *Bun*, Figueroa appeared to be actively evading arrest at the time Gil used force and did not respond to the officers' commands to get on the ground. Unlike *Deorle* and *Glenn*, officers encountered Figueroa as he was committing the suspected crimes of home invasion and arson. And although the situation here did not involve a chase like that in *Bun*, it was also not an entirely static situation like those in *Deorle* and *Glenn*. Although the facts of this case share some similarities with those in *Deorle* and *Glenn*, the Court is unable to find that those cases put the constitutional question beyond debate.

The Court finds that although Figueroa has stated a potential substantive Fourth Amendment violation, he has failed to establish that a reasonable officer should have known that the deployment of the beanbag shotgun violated clearly established law under the circumstances. Accordingly, the Court concludes that Gil is entitled to qualified immunity from liability on Figueroa's claim for excessive force in violation of his Fourth Amendment rights.

### C. Whether Fletcher is Entitled to Qualified Immunity

In the motion for summary judgment, Defendants argue that Fletcher is entitled to summary judgment on qualified immunity grounds because he was not an integral participant to the shooting. (ECF No. 67 at 13-16.) The Court agrees.

To be held liable under section 1983, a public official must "integrally participate" in the unlawful action. *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 941 (9th Cir. 2020). "The official's individual actions need not themselves rise to the level of a constitutional violation, but the official must be more than a mere bystander." *Id.* (internal quotation marks and citations omitted). In *Boyd v. Benton County*, the Ninth Circuit found that officers who stood armed behind the officer who used excessive force while he reached into the doorway and deployed a flash-bang during a search operation, who were aware of the decision to use the flash-bang, did not object to it, and participated in the search operation knowing the flash-bang was to be deployed, could be held liable for the Fourth Amendment violation. *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).

Plaintiff has not provided evidence to show that Fletcher was an integral participant to the shooting. Parties agree that Fletcher did not himself use force against Figueroa. (*See* ECF No. 67-17 at 4 ("I never said that he shot me").) The body-worn camera footage shows only Gil shooting Figueroa. (*See* ECF Nos. 67-8 (Ex. H); 67-19 (Ex. S); 95-4 (Ex. X).) Fletcher arrived at the scene when Gil already had his gun pointed at Figueroa and was only in the backyard for ten seconds before Figueroa ran to the front of the house. (Ex. X at 00:57-1:07.) Unlike the officers in *Boyd*, there is no evidence that Fletcher was aware, before he arrived, of Gil's decision to use a bean bag gun, that Gil was armed, or that he participated in the use of force in any other way. As such, there is insufficient evidence for a reasonable juror to conclude that Fletcher was an integral participant.

Because Figueroa has failed to provide evidence sufficient to create a

genuine dispute of material fact as to whether Fletcher was an integral participant in the alleged use of excessive force, Fletcher is entitled to summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment (ECF No. 67).

Defendants Gil and Fletcher are dismissed from this case.

The Court further DENIES as moot Plaintiff's motion to extend time (ECF No. 80).

DATED: December 20, 2024

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE